IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| JARLON LINER, ) | |
| ) | |
| Plaintiff, ) | Case No. 18 C 6163 |
| ) | |
| v. ) | |
| ) | Judge Robert W. Gettleman |
| FCA US LLC, a Delaware Corporation, also known ) | |
| As Fiat Chrysler Automobiles, ) | |
| ) | |
| Defendant. ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Jarlon Liner has brought a seven count complaint against his former employer, defendant FCA US LLC, a/k/a Fiat Chrysler Automobiles, and its Belvidere Plant Manager, Tomasz Gebka, alleging discrimination and retaliation based on race, age based discrimination, as well as claims for assault and battery and negligent supervision. Specifically, Count I alleges racial discrimination against FCA in violation of Title VII of the Civil Rights Act of 1964. Count II (mislabeled as Count III) alleges racial discrimination in violation of 42 U.S.C. § 1981 against FCA and Gebka. Count III (mislabeled as Count V) is a claim against FCA for discrimination under the Age Discrimination in Employment Act ("ADEA"). Count IV (mislabeled Count VI) alleges a willful violation of the ADEA. Count V (mislabeled Count VII) is an assault and battery claim against Gebka, while Count VI (mislabeled Count VIII) is a negligent supervision claim against FCA. Finally, Count VII (mislabeled Count IX) is a Title VII retaliation claim against FCA. Defendants have moved for summary judgment on all counts. For the reasons described below, the motion is granted as to all counts except the assault and battery claim against Gebka in Count V and the negligent supervision claim against FCA in Count VI.

**BACKGROUND**

As an initial matter, the court notes that neither side has bothered to include a statement of facts section in their briefs, electing instead to rely on their Local Rule 56.1 Statements by incorporating them into their briefs, forcing the court to sift through those statements and responses to determine the background and proper sequence of events. As this court has frequently noted in the past, this practice is both improper and poor lawyering. See e.g., Strychalski v. Baxter Healthcare, Corp., 2014 WL 1154030 *2 (N.D. Ill. March 20, 2014); Magnetek, Inc. v. The Travelers Indemnity Co., 2019 WL 3037080 (N.D. Ill. July 11, 2019). L.R.56.1 Statements are not intended to be substitutes for a statement of facts section in a memorandum of law. LR 56.1 Statements are to be limited to the material facts and are not to be argumentative. A statement of facts section in a brief, however, is the "'litigant's opportunity to describe the underlying events, provide relevant background information, and persuade the court.'" Strychalski, 2014 WL 1154030 at *2 (quoting Sledge v. Comcast ABB Mgmt. LLC, 2012 WL 2368319 (N.D. Ill 2012).

The parties' failure to provide background sections in their brief has left the court without a sufficient description of the underlying events leading to what defendants describe as plaintiff's resignation and what plaintiff claims was a constructive discharge. The parties simply assume that the court is as familiar as the parties with the underlying facts, jumping directly to their legal arguments without providing any context. "Rather than enlightening the court, the briefs have served only to confuse, focusing entirely on the narrow legal issues between the parties without providing sufficient background information to determine the import of those disputes." Duchossis Indus., Inc. v. Crawford & Co., 2001 WL 59031 *1 (N.D. Ill 2001).

Sifting through the L.R. 56.1 statements and responses has provided little help.

Defendant's statement is not set out in chronological order, and plaintiff's statement and responses are largely deficient. His responses deny simple undeniable facts by adding improper argument and additional facts and citing to portions of the record that do not support the denial. His own statement of facts cites to his complaint to establish that the fact is uncontested. As a result, the court has been compelled to scour the entire record just to get a simple idea of what transpired, let alone determine the truly undisputed facts. After reviewing the depositions and exhibits filed, the following is a description of the underlying events.

Plaintiff is a black male over the age of forty. He received an engineering degree from Purdue University in 1995, and a masters degree in industrial management from Central Missouri University in 1999. In August 2016 he was hired by FCA as the Industrial Engineering Manager ("IE Manager") for its Belvidere plant. Shortly thereafter, Gepka was hired as the plant manager. Gepka is from Poland and had worked for FCA (or its predecessor) in Poland and Italy, but the Belvidere job was his first in the United States. It appears that plaintiff and Gepka had issues from the start. As IE Manager for the plant, one of plaintiff's key duties was to accurately predict the manpower numbers necessary for successful production of the number of automobiles that corporate was requiring to be produced at the plant. Gebka often disagreed with plaintiff's manpower numbers and often expressed his lack of confidence in those numbers to plaintiff. Those problems occurred most often during a period in 2017 when the plant was launching three new models. By all accounts, the launch was not going smoothly, but according to plaintiff, Gepka never complained about the numbers once the launch ended in January 2018. Plaintiff admits that he was having trouble providing accurate numbers, and that individuals from outside the plant, including Jeff Davis, his immediate corporate supervisor, were brought in to counsel

him. Plaintiff takes issue with the term "counsel," preferring to call it a retraining, claiming that Davis told him he had not been trained properly when he was hired. Whatever the term, it is uncontested that Gebka had issues with plaintiff's numbers and that plaintiff had some difficulty providing proper numbers.

According to plaintiff, the genesis of his issues with Gebka and FCA stem from an educational two-week trip to Italy in early May 2017. A group of twelve was sent to Italy to learn procedures from an FCA plant there. Plaintiff was in charge of one group of six and had keys to the van they used to get around. There was another group of six younger white males using a separate van. That younger group apparently stayed out late partying and then came to work ill-prepared. Gebka found out and told plaintiff that their behavior should change. Plaintiff felt that he was being reprimanded for actions of others over which he had no control and argued with Gebka about it. He admits, however, that Gebka did not "write him up," nothing was put in his file, he was not demoted, and nothing more was ever said about it.

Plaintiff claims that that argument led to an incident that occurred on May 31, 2017. At the request of Chuck Velez from the corporate office who was at the plant to help with the launch "throughput" (the ability of the production line to deliver a number of vehicles within a given period of time), Gebka called a meeting with the team leaders. They met in the center of the department on the shop floor. Velez started speaking, using a display to show data, and asking the team leaders if they could share specific issues they were having. Gebka took the microphone and spoke for a bit. The team leaders were dismissed and Gebka asked the salary team to stay. They were in a circle. Plaintiff claims that Gebka grabbed his bicep and while squeezing his arm slapped him across his chest stating "Why don't you know about these issues." Plaintiff was so

4

upset that he left work immediately, attempted to call Davis on his way home, and then filed a handwritten complaint with the Human Resources ("HR") Department the next day. It is undisputed that he did not report the incident to the police or go to the hospital or see a doctor.

Gebka recalls the incident differently, indicating that he was in the middle of the circle speaking like a sports team coach trying to inspire his team to do better. He admits that he touched plaintiff's body with the palms of his hands simply trying to draw attention to his group that they should be performing better. He testified that he did not "strike, hit or slap" plaintiff.

The only other witness to testify about the incident was Velez, whose memory aligns more with Gebka's than plaintiff's. Velez remembered Gebka "kind of flicking his hand at [plaintiff] and saying for instance –and he, you know grabbed him by the shoulders—you have to move from the office to the floor." He then stated that Gebka "kind of moved him, you know, to understand the problems and to be able to fix them." Velez did not report the incident to HR because he did not think it was anything more than a motivational discussion. When asked if he believed it was "ok" for Gebka to strike plaintiff, he replied that "I did not feel that it was a threatening motion or—I wouldn't call it a hit." He described the incident as getting someone's attention. He did not believe the touching was offensive.

Davis and HR investigated plaintiff's complaint, spoke to Velez, and then Davis cautioned Gebka that he could not touch anyone. Gebka asked to and did meet with plaintiff, where he apologized to plaintiff privately and offered to apologize publicly in front of the other employees. Plaintiff did not consider a public apology necessary.

In January 2018 plaintiff received his performance review ("PLM") for 2017. Jeff Davis prepared the review, which required grading plaintiff on ten categories including: "Embrace and

5

cherish competition, Reach for best in class; Drive for discontinuity; Deliver as a way of life; Keep things simple; Act with integrity and be respectful; Drive teamwork and collaboration; Coach, empower, and encourage others; Demonstrate humility, honesty, and openness; Hold yourself and others accountable; and Have the courage to make tough calls." Davis had asked Gebka for his input prior to preparing the PLM, but they never got together, and Davis prepared it on his own. As it turns out, Davis rated plaintiff low in more categories than Gebka had proposed.

Gebka had asked to be in the meeting with plaintiff to discuss the PLM. That request was originally denied by management and HR, presumably because of the May 17, 2017, incident. Gebka ultimately was allowed to attend, and according to plaintiff asked that plaintiff be judged on three additional deliverables that were not part of the PLM form, areas in which Gebka thought plaintiff was deficient. Davis rejected that idea, indicating that they were not part of plaintiff's job. Plaintiff nonetheless believes that those three areas were taken into account in his overall rating of 4, to which he objects, asserting it should be a 5.

Sometime in 2018, either in his review meeting or after, plaintiff was told that he would be placed on a performance improvement plan ("PIP"). Also in 2018, again perhaps in his review, plaintiff indicated that he wanted to transfer to another plant. He applied for three jobs but was denied one for lack of qualifications, one was already filled, and for one he received no response. He apparently was offered a temporary position at another plant and claims that he was told that he had to either take that position without a PIP or stay at Belvidere under a PIP. He stayed but was never issued a PIP.

On February 27, 2018, plaintiff accepted an offer of employment Wabash National that would pay him more than he was receiving at FCA. On March 13, 2018, he rescinded his

6

acceptance, indicating that he has decided "not to leave my current situation." On June 1, 2018, he filed a charge of discrimination with the Illinois Department of Human Rights. On July 2, 2018, he received an offer of employment from Rockwell Automation that would pay him more than his salary at FCA. That same day plaintiff wrote to his supervisor at FCA resigning from his position. The letter indicates that he had a wonderful experience but that "I feel it is in the best interest of FCA and I that we part ways at this time." The letter made no mention of any alleged discrimination.

## DISCUSSION

Defendants have moved for summary judgment on all counts. Summary judgment is proper where there is "no dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The party seeking summary judgment has the burden of establishing that there is no genuine dispute as to any material fact. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). In determining whether a genuine issue of material fact exists, the court must construe all facts and reasonable inferences in the light most favorable to the nonmoving party. See CTL ex rel. Trebatoski v. Ashland Sch. Dist., 743 F.3d 524, 528 (7th Cir. 2014). But the nonmovant "is only entitled to the benefit of inferences supported by admissible evidence, not those 'supported only by speculation or conjecture.'" Grant v. Trus. of Ind. Univ., 870 F.3d 562, 568 (7th Cir. 2017).

## COUNTS III and IV

In Counts III and IV plaintiff alleges that defendants discriminated against him based on

his age in violation of the ADEA. To establish a prima facie case of age discrimination plaintiff must show that his age was the but for cause of the employment decision in question. Gross v. FBL Financial Services, Inc., 557 U.S. 167, 176 (2009). To do this, he may show that he is in the protected age group; he was performing his job according to his employer's expectations; he sustained an adverse employment action; and he was treated less favorably than similarly situated employees not within the protected age group. See Alexander v, Cit. Tech. Fin. Serv., Inc., 217 F. Supp.2d 867, 888 (N.D. Ill. 2002). If plaintiff makes this showing, the burden shifts to defendants to provide evidence of a legitimate, nondiscriminatory reason for the alleged adverse action. If defendant makes this showing, the burden shifts back to plaintiff to provide evidence that the proffered reason is pretextual. Strychalski v. Baxter Healthcare Corp., 2015 WL 738673 at * 3 (N.D. Ill. Feb 18, 2015).

Defendants argue that plaintiff has presented no evidence that his age was the cause of any action was taken. Indeed, when asked in his deposition what he based this claim on he admitted it was pure speculation. Additionally, he failed to respond to defendants' argument in his response brief. Accordingly, the court grants defendants' motion for summary judgment on Counts III and IV.

**COUNTS I AND II**

In Counts I and II plaintiff alleges that he was discriminated against based on his race in violation of Title VII and § 1981. Title VII prohibits an employer from "discriminat[ing] against any individual with respect to his compensation, terms. conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Section 1981 prohibits discrimination on the basis of race in the making and

8

forming of contracts. Smiley v. Columbia Coll. Chi., 714 F.3d 998, 1002 (7th Cir. 2013). At the summary judgment stage, courts apply the same standards to Title VII and § 1981 race claims. Id. "When a defendant a defendant moves for summary judgment, the singular question for the district court is whether the plaintiff has introduced evidence that would permit a reasonable factfinder to conclude that the plaintiff's race . . . . caused the discharge or other adverse employment action." Igasaki v. Ill. Dept. of Fin. And Professional Reg., 988 F.3d 948, 957 (7th Cir. 2021) (internal quotations omitted).

One method of proving employment discrimination under Title VII or §1981, is the now familiar burden shifting framework outlined in McDonnell Douglas v. Green, 411 U.S. 792 (1973). Under this approach, the plaintiff must make a prima facie case of discrimination, at which point the burden shifts to the employer to offer a nondiscriminatory motive. If the employer meets that burden, the burden shifts back to the plaintiff to show that the stated reason was a pretext. Igasaki, 988 F.3d at 957. To establish a prima facie case, the plaintiff must show that: 1) he is a member of the protected class; 2) he met his employer's legitimate expectations; 3) he suffered an adverse employment action; and 4) a similarly situated employee outside the protected class received better treatment from the employer. Id.

Plaintiff's claims fail under any method. At this stage, what matters most is whether plaintiff has presented enough evidence to allow a jury to find in his favor. His evidence falls woefully short. First, there really is no dispute that plaintiff's performance in 2017 was not up to expectations, given that he admits that he had trouble with his most important job—assessing manpower needs. Moreover, the is no evidence that Davis, who prepared plaintiff's review, was influence by plaintiff's race in any way. Plaintiff admitted such in his deposition and stated that

9

Davis never discriminated against him. Nor is there any evidence that any of Gebka's actions toward plaintiff were race-based in any way. Indeed, plaintiff's handwritten complaint to HR about the May 31, 2017, alleged assault and battery makes no reference to racial discrimination. And, the evidence plaintiff presented shows that Gebka had previously been accused of inappropriately touching a white employee. Plaintiff does attempt to cast Gebka as a racist by indicating that on occasion Gebka told his crew that they should not be slaves to data and that they should not necessarily adopt their performance to the forms they were required to fill out. According to plaintiff, the word slave can never be used in front of a black person without indicating racial hostility. The court rejects outright this argument, but in any event, plaintiff admits that the statements were never directed specifically at him. There is simply no evidence in the record to suggest that Gebka's view of plaintiff's performance was based in any way on plaintiff's race.

Nor is there any evidence that plaintiff was constructively discharged, which occurs when a plaintiff shows that he was forced to resign because his working conditions, from the standpoint of a reasonable employee, had become unbearable. Fischer v. Avanade, Inc., 519 F.3d 393, 408-09 (7th Cir. 2008). Constructive discharge can take two forms. First, the plaintiff can demonstrate a discriminatory work environment even more egregious than the high standard for a hostile work environment claim. Second, the plaintiff can demonstrate that the employer that communicates to a reasonable employee that he will be terminated, and then the plaintiff resigns. This can occur if based on the employer's actions, the handwriting was on the wall and the axe was about to fall.

Plaintiff has presented no evidence to support either form. There is no evidence at all

10

about his working conditions, and certainly no evidence that they were intolerable. He tries to argue that FCA posted his position when he asked for a transfer, but there is no evidence that he was going to be terminated and he elected to stay at FCA despite a better offer.

Moreover, even if he could demonstrate an adverse employment action, he is unable to show that any similarly situated individual outside the protected class was treated better. He argues that one white IE Manager with a poor PLM was offered a transfer to a permanent position, while he was offered only a temporary position, but he has presented no admissible evidence to support that argument. Specifically, there is no evidence that the white manager worked for the same plant manager, had the same direct supervisor, dealt with the same product lines or launch or had the same problems determining manpower. In short, there is simply no evidence from which a reasonable jury could conclude that plaintiff was constructively discharged or in any way discriminated against based on his race. Consequently, the court grants defendant's motion for summary judgment on Counts I and II.

## COUNT VII

In Count VII plaintiff alleges that FCA retaliated against him for opposing and making charges about conduct that he believed to be in violation of Title VII. Title VII prohibits employers from discriminating against an employee "because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing." 42 U.S.C. § 2000e-3(a). "As with discrimination claims, the question for a retaliation claim should always be: 'Does the record contain sufficient evidence to permit a reasonable fact finder to conclude that retaliatory motive caused the discharge.'" Igasaki, 988 F.3d at 959 (quoting Lord v. High

Voltage Software, Inc., 839 F.3d 556, 563 (7th Cir. 2016). To prevail on his Title VII retaliation claim plaintiff must prove that:1) he engaged in protected activity; 2) he suffered an adverse employment action; and 3) there is a causal link between the protected activity and the adverse action.

In the instant case, plaintiff alleges that FCA (more specifically Gebka) began retaliating against him when he complained to HR about the May 31, 2017, alleged assault and battery. But, as already noted, his handwritten complaint to HR made no reference to racial or any other form of discrimination prohibited by Title VII. His complaint did not constitute protected activity and cannot support a claim for Title VII retaliation. Consequently, the court grants defendants' motion for summary judgment on Count VII.

**COUNT V**

In Count V plaintiff alleges a state law claim for assault and battery against Gebka. Under Illinois law, battery is the unauthorized touching of another that offends a reasonable sense of personal dignity. Chelios v. Heavener, 520 F.3d 678, 692 (7th Cir. 2008). "To be liable for battery, the defendant must have done affirmative act, intended to cause an unpermitted contact." Schroeder v. Lufthansa German Airlines, 875 F.3d 613, 622 (7th Cir. 1989). Not every unconsented contact is a battery. The contact must be of a harmful or offensive nature. Id.

In the instant case, there is a genuine dispute as to the extent and nature of the contact, making it impossible to determine on summary judgment whether the contact was indeed harmful or offensive. Consequently, defendants' motion for summary judgment on Count V is denied.

**COUNT VI**

In Count VI plaintiff alleges a claim for negligent supervision against FCA regarding the alleged assault and battery. Defendants argue that this claim is preempted by the Illinois Human Rights Act ("IHRA"), which provides that courts in the State of Illinois do not have jurisdiction over alleged civil rights violations other than those set forth in the IHRA. 775 ILCS § 5/8-111(c). This "preemption" applies to any state law claim in which the plaintiff must prove discriminatory motive or impact and extends to claims that a plaintiff cannot establish independent of any legal duty created under the act. Seehawer v. Madnecraft Elec. Co., 714 F. Supp. 910, 914 (N.D. Ill 1989). Obviously, plaintiff can satisfy the elements of common law battery without relying on rights under the IHRA. Thus, there is no preemption. See Maksimovic v. Tsogalis, 171 Ill. 2d 511, 516 (1997). Consequently, the court denies defendants' motion for summary judgment on Count VI.

**CONCLUSION**

For the reasons described above, defendants' motion for summary judgment is granted as to Counts I-IV and VII and denied as to Counts V and VI.

**ENTER:**

_Robert W. Gettleman_
**Robert W. Gettleman
United States District Judge**

**DATE: September 17, 2021**